## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

WILLIAM WARE and CAROL CAUL,       §
                                   §
          Plaintiffs,              §
                                   §
VS.                                §     CIVIL ACTION NO. H-04-2295
                                   §
                                   §
UNITED STATES FEDERAL              §
HIGHWAY ADMINISTRATION,            §
*et al.*,                          §
          Defendants.              §

## MEMORANDUM AND OPINION

Plaintiffs William Ware and Carol Caul filed this *pro se* suit challenging a highway construction project in Houston, Texas.  The plaintiffs live near Interstate Highway 610 South Loop West (IH-610 West), close to where it intersects with Interstate Highway 10 (IH-10).  The section of IH-610 West near the plaintiffs' home was built in the 1960s; the plaintiffs moved into their residence in 1987.  In 1991, state and federal officials concluded that because of the "severe traffic congestion" in the area, changes had to be made.  After evaluations, reevaluations, and a bidding process, construction on this part of the IH-610 "Rehabilitation Project" began in June 2003.  On June 15, 2004, the plaintiffs sued state and federal highway officials and agencies involved in reviewing and approving the project, alleging that the elevation of reconfigured lanes and connectors will greatly increase the noise heard in the nearby homes and parks and that the elevation of a new exit ramp is also a visual pollutant.  (Docket Entry No. 1).  The plaintiffs assert that the defendants violated

statutory, regulatory, and constitutional requirements in reviewing and approving the highway project.  The plaintiffs ask this court to issue a  preliminary injunction requiring the defendants to perform a new noise analysis, subject to court supervision, and to stop the construction until the analysis is complete and new mitigation or other measures approved.  In response, the defendants argue that the plaintiffs have no legal basis for their claims or for the relief they seek.

This court has carefully reviewed the pleadings, the motions and responses, the parties' submissions, and the applicable law.  Based on this review, this court grants the defendants' motion for summary judgment, finding that the law does not allow the plaintiffs to proceed on the claims they assert.  As a result, the preliminary injunction must be denied.  The reasons for these rulings are set out in detail below.

## I.    Background

This summary is drawn from the administrative record and affidavits that the parties have submitted.  Although the parties may dispute the way some events are described or characterized, none of these disputes is material to determining whether the plaintiffs' legal claims can proceed.

### A.    The Parties and Claims

The plaintiffs, Carol Caul and William Ware, own a condominium near the area that is under construction IH-610 South Loop West, close to the intersection of IH-10.  IH-610 is part of what is called the "Loop," a freeway that circles the City of Houston and allows access to the interstates that run east-west and north-south as well as to other major

2

highways.  The West Loop is approximately 5.5 miles west of downtown and serves local and regional traffic in Houston and western Harris County.  According to Ware's affidavit, the plaintiffs' front door is approximately 750 feet from the edge of the reconfigured IH-610 project.  In his affidavit, Ware states that with the present highway configuration, they can "hear the highway roar of 610 and I-10 at [our] front door sidewalk."  (Docket Entry No. 51, Ex. 31, ¶ 4).  The record shows that the average daily traffic over this section of IH-610 increased over ninety percent between 1969 and 1989.  As noted, the plaintiffs moved into their home in 1987.

Caul is a lawyer.  Ware is a "self-employed instructor and consultant" who has "been involved in the energy industry."  (*Id.* at ¶ 5).  He has an undergraduate and master's degree in chemical engineering and a master's in business administration.

The plaintiffs sued:  (1) the United States Federal Highway Administration (FHWA); (2) Curtis Dan Reagan, Division Administrator of the FHWA, Texas Division, in his official capacity; (3) Mary E. Peters, Administrator of the FHWA, in her official capacity; (4) the United States Department of Transportation (DOT); (5) Norman Y. Mineta, Secretary of the DOT, in his official capacity; (6) the Texas Transportation Commission; and (7) Richard F. Williamson, Chair of the Texas Transportation Commission, in his official capacity.  The first five defendants are occasionally referred to as the "Federal Defendants" or the "FHWA"; the last two defendants are occasionally referred to as the "State Defendants" or "TXDOT."  The plaintiffs alleged violations of the Federal Aid Highways Act, (FAHA), 23 U.S.C. §§ 109 and 128; the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321

*et seq.*; the Administrative Procedures Act, (APA), 5 U.S.C. § 706 *et seq.*; and the Civil

Rights Act, 42 U.S.C. § 1983.  (Docket Entry Nos. 1, 37).

In a previous Memorandum and Order, this court granted in part and denied in part

motions to dismiss filed by some of the defendants.  (Docket Entry No. 64).  Specifically,

this court denied the motion to dismiss the plaintiffs' claims for lack of standing; granted the

motion to dismiss claims brought directly under the FAHA and NEPA because the statutory

section the plaintiffs invoked provide no private right of action; denied the motions to

dismiss the APA claims; and granted the motions to dismiss the section 1983 claims.  The

following motions are addressed in this opinion: plaintiffs' motion for reconsideration,

(Docket Entry Nos. 67, 68), to which defendants have responded, (Docket Entry Nos. 72,

73); plaintiffs' motion for preliminary injunction (Docket Entry No. 59), to which the

defendants have responded, (Docket Entry No. 65); and defendants' renewed motion to

dismiss and a motion for summary judgment, (Docket Entry No. 65), to which the plaintiffs

have responded, (Docket Entry No. 70).

### B.    The Issues

Although the project extends along IH-610 West from IH-10 West to West Bellfort,

approximately seven miles, the segment at issue is from south of Post Oak Boulevard to IH-

10, near and at the intersection of the two interstate highways.  The record shows that

TXDOT planned two separate highway construction projects, one along IH-610 and one

along IH-10, but combined the work at the interchange of IH-610 and IH-10 for contracting

purposes.

The project design changed from the original proposal. As approved by TXDOT and the FHWA in 2001, the project included an elevated exit ramp near the IH-610 West intersection with IH-10 to reduce traffic weaving and to increase the vertical clearance for the traffic below the overpass to bring the highway into compliance with modern standards. This ramp is approximately seventy feet above the ground at its highest point. The plaintiffs refer to the elevated ramp as "Godzilla-like" and decry its intrusive visual presence near their neighborhood on one side of the freeway and near a large park and arboretum on the other side. The plaintiffs allege that the new ramp did not need to be so high to meet the stated design objectives.

The project also added auxiliary lanes and connectors closer to the plaintiffs' neighborhood home than the antiweaving ramp. The plaintiffs allege that the elevation of these mainlanes and connectors will increase the level of noise they will experience beyond the level projected for, or addressed by, the project design. The plaintiffs contend that installed and contemplated noise barrier walls will lessen the noise only for the homes next to the walls but will not significantly reduce the noise for homes located further away. As noted, the plaintiffs' condominium is approximately 750 feet away from the reconfigured freeway.

In 1992, the FHWA approved the IH-610 project as a "Categorical Exclusion" (CE) under NEPA. This status meant that the project did not require an Environmental Assessment (EA) or an Environmental Impact Statement (EIS), which involve higher levels of NEPA documentation than a Categorical Exclusion. To approve a project as a Categorical

Exclusion, the FHWA must find that the project does not involve significant environmental impacts, defined in 23 C.F.R. § 771.117(a). The plaintiffs allege that the project should not have been approved as a Categorical Exclusion and assert that as a result, the project violates NEPA and the APA. In 2001, TXDOT issued a Reevaluation for the project, concluding that although the project plans had changed since 1992, Categorical Exclusion status remained appropriate and no additional environmental studies were necessary. Both the 1992 and 2001 Reevaluations included noise-impact studies. The FHWA relied on the 2001 Reevaluation in deciding to provide federal funds for the project.

In 2004, TXDOT notified the FHWA of a miscalculation in the earlier noise-impact studies done on the IH-610 Rehabilitation Project. (Docket Entry No. 41, App. B at 8). TXDOT submitted another reevaluation report that included a new noise analysis. That study, issued in July 2004, concluded that the noise level would be higher than originally projected, but with adequate noise-mitigation measures, would not cause a "significant environmental impact" under NEPA. The plaintiffs challenge this finding, again asserting that it violates NEPA and the APA.

The plaintiffs generally allege that the project under construction is not the project that the defendants disclosed to the public or submitted for approval. The plaintiffs argue that the defendants concealed relevant information, making the process by which they obtained approval deficient under the applicable statutes and regulations. The plaintiffs allege that the defendants concealed the elevations of the ramps and lanes and the projected noise impacts as part of a wide-ranging conspiracy to punish plaintiffs (and plaintiffs' neighborhood) for

earlier challenges to highway construction projects.  The plaintiffs also allege that a "more likely conspiracy" existed to hide the projected "above standard noise levels of the . . . mainlanes and connectors . . . on the Plaintiffs' neighborhood including Memorial Park and how this came to be (and continues to be ignored by the federal and state agencies)."  The plaintiffs allege that this case "involve[s] a trail of deception, misleading statements to federal judges, and the misconduct on the part of certain employees and the management of the Texas Department of Transportation that may ultimately have to be pursued by federal legal enforcement."  (Docket Entry No. 68 at 5–6).  The defendants note that the project was nearly forty-five percent complete when the plaintiffs first filed this suit; plaintiffs respond that the defendants concealed information that would have allowed suit to be filed earlier.

## II.     The Plaintiffs' Motion for Reconsideration

Plaintiffs move for reconsideration of this court's previous Memorandum and Order addressing the defendants' motions to dismiss.  The plaintiffs contend that this court improperly dismissed their claims against the State Defendants.  The plaintiffs assert that the Transportation Equity Act for the 21st Century (ISTEA), 112 Stat. 232, Public Law 105-178 (1998), allows such lawsuits against state actors.  Plaintiffs also request "clarification" of several issues.  In this part of their motion, plaintiffs argue that this court's reference to the arbitrary and capricious standard of review, although not directly at issue in this court's previous Memorandum and Order, misstated the standard that should be applied to their NEPA and APA claims.  Plaintiffs also seek clarification as to whether this court determined that they lack standing to seek relief for "cumulative harms" allegedly caused by the

defendants' conduct, and whether the Fifth Amendment "takings" claims survived the motions to dismiss.[1]

This court denies the motion to reconsider its earlier conclusion that the plaintiffs cannot sue the State Defendants under the ISTEA.  Plaintiffs cite section 1309 of ISTEA to support their argument.  Section 1309 does not provide a private cause of action against the State Defendants.  Instead, section 1309 addresses state highway commissions, such as TXDOT, in relation to certain federally-funded highway projects that receive streamlined approval procedures.  The IH-610 Rehabilitation Project and the IH-610 interchange with IH-10 at issue in this case are not covered by section 1309.  And, as defendants pointed out in their response to plaintiffs' motion to reconsider, Congress repealed this section of the ISTEA when it passed section 6002(1)(d) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act; A Legacy for Users (SAFETEA-LU), Pub. Law No. 109-59 (August 10, 2005).  The motion to reconsider on the basis that ISTEA provides the plaintiffs a basis for suing the State Defendants is denied.

The plaintiffs argue that they would not be able to obtain relevant documents in the State Defendants' control if this court does not retain the State Defendants in the case. (Docket Entry No. 70 at 3).  This argument fails.  A need for discovery does not create jurisdiction.  Moreover, the rules provide for discovery against third parties.  And, as

---

[1]

In this motion, plaintiffs also ask this court to "clarify" the effect of the brief summary of the "background facts" in the previous Memorandum and Opinion.  The summary in that opinion did not constitute fact findings; the court was analyzing pleadings, not evidence.

discussed more fully below, a court reviews agency action based on the administrative record before the agency when it made the challenged decision.  *Inst. for Tech. Dev. v. Brown*, 63 F.3d 445, 450 (5th Cir. 1995); *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 624 (5th Cir. 1993).   A narrow exception permits a court to examine evidence beyond the administrative record if that evidence: (1) explains technical information or agency action not adequately explained in record; (2) shows an agency failed to consider relevant evidence; or (3) shows an agency, in bad faith, failed to include information it considered in the record. *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973);  *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998); *Fort Sumter Tours v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995). The plaintiffs have not argued or shown that these factors are present so as to require discovery  to obtain documents beyond the administrative record.

The plaintiffs incorrectly argue that this court identified the wrong standard for reviewing their challenges to the agency actions that led to the approval of the IH-610 West Rehabilitation Project from Post Oak through the IH-10 interchange.  The plaintiffs rely on *United States v. Mead*, 533 U.S. 218 (2001), to support this argument.  In *Mead*, the Supreme Court held that federal courts must provide only *Skidmore* deference, not *Chevron* deference, to a tariff-classification ruling by the United States Customs Service.  *Id.* at 221.  In applying *Skidmore* deference, a court respects the agency's interpretation only insofar as it has the power to persuade.  *Id.* at 235 (citing and discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  The *Chevron* standard is more deferential.  It applies when it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress

would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills space in the enacted law, even one about which Congress did not actually have an intent as to a particular result." *Mead*, 533 U.S. at 229 (internal citations and quotations omitted).  In *Mead*, the Court analyzed the agency's authority to make the tariff-classification ruling at issue and the ruling itself (both in terms of process and substance).  The Court concluded that Congress did not intend to delegate authority to Customs to issue classification rulings with the force of law.  Instead, Congress contemplated that such rulings would bind only the specific parties to a dispute, not to serve as a precedent for other cases.  *Id.* at 232–33.  The fact that tariff-classification rulings are "churned out at a rate of 10,000 a year at an agency's 46 scattered offices" supported this conclusion.  *Id.* at 233.  The Court explicitly stated that *Mead* did not abrogate *Chevron*.  In *Mead*, the Court only addressed a narrow issue, whether specific-tariff classification rulings challenged in litigation should receive *Chevron* deference.  *See id.* at 227–32.

Plaintiffs cite no law to support their contention that *Mead* requires *Skidmore* deference in NEPA cases.  Unlike the statute authorizing Customs to make tariff-classification rulings that was at issue in *Mead*, the legislation authorizing the FHWA to approve federal funds for highway construction projects demonstrates that Congress intended that agency to speak with the force of law in interpreting highway regulations.  Customs tariff-classification rulings involve substantially less process than the FHWA regulations, substantially less agency work, and affect only the parties before the Customs agency at any

given time.  By contrast, the highway regulations require substantial process, involve significant agency personnel, and necessarily affect large numbers of people.

*Chevron* deference is also appropriate because the plaintiffs seek review under the Administrative Procedures Act, 5 U.S.C. § 706.  Under the APA, agency action may be held unlawful and set aside only if found to be  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Fifth Circuit has continued to apply *Chevron* deference in cases challenging FHWA agency action under NEPA after the Supreme Court decided *Mead*.  *See, e.g.*, *City of Shoreacres v. Waterworth*, 420 F.3d 440 (5th Cir. 2005); *Davis Mountains Trans-Pecos Heritage Found. v. Fed. Aviation Admin.*, 116 Fed. Appx. 3 (5th Cir. 2004); *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003).  The Fifth Circuit's continued application of the *Chevron* "arbitrary and capricious" standard in cases reviewing FHWA agency actions under NEPA binds this court.

The plaintiffs also seek "clarification" as to whether this court's previous Memorandum and Order was "intended as a limitation on the standing of the Plaintiffs to seek relief from the cumulative environmental impacts on behalf of all similarly situated stakeholders along the interchange."  (Docket Entry No. 68 at 3).  This court did not dismiss plaintiffs' claims that the defendants improperly analyzed, refused to analyze, or inappropriately rejected a full analysis of "cumulative harms" that plaintiffs assert on behalf of themselves and other residents impacted by the challenged construction project.  These arguments are addressed below in this court's analysis of the NEPA claims.

The plaintiffs also seek "clarification" as to whether they may use the APA to pursue their claim that the Federal Defendants violated their Fifth Amendment rights.  This court denies the plaintiffs' motion insofar as it seeks reconsideration of the previous Memorandum and Order dismissing the Fifth Amendment claims against the Federal Defendants.  Plaintiffs' complaint does invoke the Fifth Amendment (*see* Docket Entry No. 37, ¶¶ 145 *et seq.*), but these sections of the complaint reiterate the same claims that are properly invoked under the APA and NEPA.  The plaintiffs' own submissions to this court undermine their ability to claim that they suffered a "taking" cognizable under the Fifth Amendment.  A taking claim requires  a physical invasion of the plaintiff's land by the government, or government regulation that has denied the plaintiff "all economically beneficial or productive use of land."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).  The plaintiffs have not alleged facts that, if proven, would make either showing.  Because the plaintiffs have not stated a "taking" claim for which relief could be granted, this court denies the motion to reconsider its grant of the defendants' motion to dismiss the Fifth Amendment claims.

The plaintiffs' motion for reconsideration is denied.

## III.    NEPA and the Standard of Review

The FHWA has moved for summary judgment on the NEPA claims.  The plaintiffs

respond by arguing that disputed issues material to determining whether the FHWA violated

NEPA in approving the IH-610 West Rehabilitation Project section at issue preclude

summary judgment.

### A.    The Legal Standards

In enacting NEPA, Congress sought "[t]o declare a national policy which will

encourage productive and enjoyable harmony between man and his environment; to promote

efforts which will prevent or eliminate damage to the environment and biosphere and

stimulate the health and welfare of man."  42 U.S.C. § 4321.  The statute requires, to the

fullest extent possible, that Federal Government agencies:

> include in every recommendation or report on proposals for legislation and
> other major Federal actions significantly affecting the quality of the human
> environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the
> proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and
> the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would
> be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). NEPA requires federal agencies to take a "hard look" at the environmental implications of their actions or omissions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). The statute is procedural; it does not require "that agencies achieve particular substantive environmental results" but it is "action-forcing" in that it compels agencies to collect and disseminate information about the environmental consequences of proposed actions within their jurisdiction. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

The FHWA is governed by a set of regulations that require it to follow NEPA and Council on Environmental Quality ("CEQ") regulations. *See* 23 C.F.R. § 771.101 *et seq.* The FHWA is required to conduct a review of all "major Federal actions" within its jurisdiction to ensure compliance with NEPA. The CEQ regulations require an agency to designate actions that normally require an Environmental Impact Statements (EIS), actions that normally require no environmental evaluation and may be regarded as a Categorical Exclusions (CE), and actions that fall in the middle and require an Environmental Assessment (EA). 40 C.F.R. § 1507.3(b)(2)). An EA results in either a determination that the action will have a significant environmental impact and require an EIS, or a "finding of no significant impact,"—FONSI—indicating that no EIS is needed. 40 C.F.R. § 1508.9(a)(1). "An EA should be brief." *Fritiofson v. Alexander*, 772 F.2d 1225, 1237 (5th Cir. 1985) (citing 40 C.F.R. § 1508.9; 33 C.F.R. § 230.9(b)). An EA should "include brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed action and alternatives, and a listing of agencies and the persons consulted."

40 C.F.R. § 1508.9(b).  The brief discussion should reflect "reasoned decision making" as to whether there is a sufficient likelihood of significant environmental consequences to require preparation of an EIS.  *Fritiofson*, 772 F.2d at 1236 (citing *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)).

The FHWA has divided federally-aided highway projects into three classifications: (a) Class I actions, which require that agencies prepare an EIS for all "major federal actions significantly affecting the quality of the human environment"; (b) Class II actions, which do not significantly affect the environment individually or cumulatively and qualify as Categorical Exclusions; and (c) Class III actions, in which the significance of the environmental impact is not clearly established.  23 C.F.R. § 771.115.  Class III proposals require preparation of an EA "to determine the appropriate environmental document required."  *Id.* at § 771.115(c).

If a project qualifies as a Categorical Exclusion, the agency need not perform an EA or an EIS. A Categorical Exclusion is a category of actions that have been determined, because of their nature and past experience, not to have, individually or cumulatively, a significant effect on the human environment. 40 C.F.R. § 1508.4; 23 C.F.R. § 771.117.  Such actions are "categorically excluded" from the requirement of either an EA or EIS review. Categorical Exclusion projects "do not induce significant impacts to planned growth or land use for the area; do not require the relocation of a significant number of people; do not have a significant impact on any natural, cultural, recreational, historic, or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impact on

travel patterns; or do not otherwise either individually or cumulatively, have any significant environmental impacts."  23 C.F.R. § 771.117(a).

The FHWA regulations specify two categories of actions that may be categorically excluded from detailed NEPA review.  *See* 23 C.F.R. § 771.115(b).  The first category consists of a list of twenty different actions that are deemed to meet the general Categorical Exclusion requirements without any further administrative approvals or NEPA documentation.  Examples of this class of actions are the installation of bicycle and pedestrian lanes, paths, and facilities, the installation of noise barriers and the installation of fencing where no substantial land acquisition or traffic disruption will occur.  *See* 23 C.F.R. § 771.117(c)(3), (6), (8).  This category does not apply here.  The second category is comprised of additional actions that may be designated as Categorical Exclusions after receiving administrative review and approval.  Such administrative approval requires documentation demonstrating that the proposed action: (1) satisfies the general Categorical Exclusion requirements (40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a)); and (2) will not result in significant environmental effects.  The FHWA regulations provide a nonexclusive list of the types of actions that may qualify under this second category—the documented Categorical Exclusion category—including: (1) "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing)"; (2) "[h]ighway safety or traffic operations improvement projects including the installation of ramp metering control devices and lighting"; and (3) "[b]ridge rehabilitation, reconstruction or replacement."  23 C.F.R. §

771.117(d)(1), (2), (3).  The FHWA used the first portion of this second type of Categorical

Exclusion in approving the IH-610 West Rehabilitation Project portion at issue in this case.

Even after a project is approved for Categorical Exclusion status, the project must be

reviewed again to ensure that the classification remains appropriate.  23 C.F.R. § 771.129(c).

The regulations contemplate an initial review and determination, with a reevaluation taking

place before the applicant actually receives and begins using federal funds.  *Id.*  The FHWA

can require further documentation.  *Id.*  After a highway project is approved for Categorical

Exclusion status, the ongoing review and consultation process may require further study of

environmental impacts and proposed mitigation measures.  *See, e.g.*, *Pub. Interest Res.*

*Group of N.J., Inc. v. Fed. Highway Admin.*, 884 F. Supp. 876, 882–83 (D.N.J. 1995) (state

highway commission, which had received CE status for its project, conducted "an

Environmental Reevaluation (the 'ER') to study any potential environmental impact resulting

from the Project and to plan to minimize and mitigate any such impact").

The plaintiffs challenge the FHWA's decision to treat the IH-610 West project section

at issue as Categorically Excluded.  The issue is whether that decision was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); *see also Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669,

677 (5th Cir. 1992) (abandoning the "reasonableness" standard in favor of the "arbitrary and

capricious" standard based on intervening Supreme Court precedent).  Courts have noted that

"an agency's decision to categorically exclude a proposed project from environmental review

'is entitled to substantial deference.'"  *Friends of Pioneer St. Bridge Corp. v. Fed. Highway*

*Admin.*, 150 F. Supp. 2d 637 (D. Vt. 2001) (quoting *City of New York v. ICC*, 4 F.3d 181, 186 (2d Cir. 1993)); *see also Fla. Keys Citizens Coalition, Inc. v. United States Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1139 (S.D. Fla. 2005) ("Deference is particularly appropriate where an agency is interpreting its own regulations in applying a categorical exclusion.") (citing *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1020 (4th Cir. 1985)).  A short, contemporaneous explanatory statement that the agency is invoking a Categorical Exclusion is normally all that is required.  The statement's purpose is to inform the reviewing court that before approving the action, the agency did, in fact, consider whether the Categorical Exclusion applied.  *See Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy.  It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did. . . . In most instances, a short statement that a  categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.").  A Categorical Exclusion may be used even in environmentally sensitive areas, so long as the applicable criteria and documentation are satisfied.  *See Krichbaum v. United States Forest Serv.*, 17 F. Supp.2d 549, 558 (W.D. Va.1998) (upholding reliance on Categorical Exclusion, even though the project area included municipal watershed); *see also Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996) (agency may invoke Categorical Exclusion even if endangered or threatened species are present based on determination that project will not negatively impact the species).

In *City of Alexandria*, the court deferred to the FHWA's reliance on the Categorical Exclusions listed in its regulations in approving a highway-safety improvement project. According to the court, "the more specific examples of categorical exclusions listed in the regulations, rather than a party's or our own notions of substantiality," should govern the decision whether a project is properly considered not to have significant environmental impacts and appropriate for Categorical Exclusion status. 756 F.2d at 1019.  In so ruling, the court noted that, although the project at issue had gone through five years of planning, required the expenditure of millions of dollars, and involved the second busiest highway in the county, these factors did not determine whether a Categorical Exclusion was available. Instead, the determinative factors were the environmental impacts.  *Id*.  The court further ruled that, if the record indicates an agency has considered environmental impacts, the agency's decision as to whether the impacts are significant merits deference.  In that case, although plaintiffs had submitted some evidence suggesting that the project could potentially result in the diversion of traffic from the highway to local streets, the court deferred to the FHWA's conclusion that such possible impacts were likely to be insubstantial.  *Id*. at 1021. Similarly, in *Florida Keys Citizens Coalition*, the court rejected challenges to the treatment of a highway improvement project in the Florida Keys as a Categorical Exclusion:

> [G]iven the agency's documented determination that the Road Safety Improvements will not add any general purpose travel lanes and involve only minimal roadway widening for safety and not capacity improvements, that these improvements will not have significant growth or travel impacts, that the improvements will not induce significant impacts on planned growth or land use or have significant impacts on travel patterns, that they will be entirely within the existing right-of-way, thus, not causing the relocation of significant

numbers of people, and that an original Project purpose, accommodation of growth in the Florida Keys, was eliminated by downsizing it from the original four lanes to two lanes.

374 F. Supp. 2d at 1141.

The statutory and regulatory analysis discussed in these cases must be applied to the administrative record the parties submitted.

## B.      The Administrative Record

The administrative record submitted to this court consists of the following:  (1) Environmental Assessment (EA) dated August 1991; (2) Categorical Exclusion (CE) dated December 1992; (3) Public Hearing Summary and Certification from TXDOT from the June 15, 2000 public hearing; (4) Reevaluation dated June 2001 ("2001 Reevaluation"); and (5) Reevaluation dated July 2004 ("2004 Reevaluation").  The FHWA also submitted affidavits from John Mack, a District Engineer for the FHWA; Gabriel Y. Johnson, a TXDOT engineer currently serving as Director of Transportation Planning and Development for the Houston District; A. Hassan Nikooei, a TXDOT engineer currently serving as Project Manager of Advanced Project Development for the Houston District; and Claude Patrick Henry, a TXDOT engineer currently serving as Director of Project Development.  The affidavits are relevant to this inquiry to authenticate the submitted documents.

1.      *The 1991 Environmental Assessment Report*

The 1991 Environmental Assessment, (Docket Entry No. 48, Ex. 1-1), was issued by TXDOT.[2]  The EA begins with a  discussion of  the history of IH-610 West and the severe traffic and safety problems it presented.  The 1991 EA noted that IH-610 West between I-10 West and US-59 South, opened in 1966, had experienced a ninety percent increase in average daily traffic between 1969 to 1989, making it the second most congested roadway in Harris County.  (The busiest was IH-10 West between the intersection of IH-610 West and a road just west of the intersection.)  The report noted that the 1989 average daily traffic count of 218,000 vehicles per weekday and the predicted future count of 350,000 vehicles per weekday by 2010 greatly eclipsed the existing capacity of 150,000 vehicles per weekday. (*Id.* at 8–9).  In short, traffic capacity could not meet future demands.  The 1989 accident rate on IH-610 between North Braeswood and IH-10 was over 1.5 times that national average and over twice as high as the accident rate in 1980.  The EA noted that the traffic load, plus age, weather, and earth settlement, had combined to undermine the infrastructure of IH-610 West. (*Id.* at 9).  TXDOT explained that the West Loop "is no longer current with today's design standards."   The Loop did not have sufficient distances between entrance ramps and subsequent exit ramps; the ramps were not long enough to provide necessary acceleration and deceleration distances; and inadequate vertical clearances underneath cross-street overpasses. (*Id.* at 2–3, 9).  There were insufficient auxiliary lanes, resulting in the use of shoulder lanes

---

[2] The defendants attached the 1991 Environmental Assessment to the 1992 Categorical Exclusion report.

as auxiliary lanes in many areas that in turn removed the availability of shoulders as emergency stopping "safety zones." (*Id.* at 9). The introduction concluded by stating, "every option short of reconstruction has been exhausted to safely increase the capacity on IH 610W." (*Id.* at 10).

The 1991 EA  analyzed an ambitious construction plan: widening the freeway from eight to twelve mainlanes, with accompanying grade-separated or "braided" on- and off-ramps. (*Id.* at 11). (A "braided" ramp structure means that one ramp goes over another.) The 1991 EA identified the specific highway segments that the construction project would affect and described the proposed modifications. (*Id.* at 12–13). The "Alternatives Considered" portion of the 1991 EA report noted that members of the public objected in early 1990 after newspaper articles described initial proposals to create elevated express lanes in one section of the highway. (*Id.* at 19). Groups representing nearby businesses, particularly those in and around the nearby densely-populated shopping and office complex known as the Galleria, neighborhood associations, and environmental groups expressed concerns "that the elevated express lanes would create noise and visual impacts to the area, and negative environmental impacts to Memorial Park, the Arboretum, and Buffalo Bayou." (*Id.*). As a result of the objections, the Texas Highway Commission appointed a task force known as the West Loop Joint Committee consisting of representatives "from all of the groups expressing concerns[ ] to assist in the development of viable alternatives for" the Galleria-Post Oak

segment of the project.[3]  (*Id*. at 20).  "Numerous meetings were held between [TXDOT] and local business interests, public agencies, neighborhood and environmental groups from mid-1988 through late 1990 to discuss the proposed improvements to the facilities."  (*Id*. at 19).

The 1991 EA report described and evaluated twelve options for achieving "the most efficient and safe freeway practicable."  (*Id*. at 14).  The task force selected three options for further study.  The EA focused on these three options: (1) "Option 10," TXDOT's original proposal, which featured two elevated express lanes, widened mainlanes, and lengthened and improved entrance and exit ramps ; (2) "Option 11," which featured two express lanes depressed below ground level; and (3) "Option 12," the preference of community members, which featured five dedicated express lanes in each direction between US-59 South and IH-10 West, with no entrance/exit ramps other than access from the interchanges.  This option required local traffic to use two seven-lane collector/distributor "facilities," consisting of four "collector" through lanes in each direction on the outer side of the express lanes and a three-lane frontage "distributor" road providing access to and from the collector road.  (*Id*. at 14–16).

TXDOT rejected Option 11 as cost-prohibitive; the initial estimate was over $401 million, compared with $241 million and $261 million for Options 10 and 12, respectively.  (*Id*. at 24).  The locally-preferred Option 12 was rejected in part because of the rights-of-way

---

[3]

Members included representatives of area businesses, the public transit authority, the City Planning Commission and Parks Department, representatives from groups involved with the area parks, representatives of neighborhood groups, and volunteer professional engineering and architectural consultants.  (*Id*. at 21).

required.  Option 12 would require the acquisition of approximately 30 acres of additional

rights-of-way and would cause 22 displacements.  Option 10 would require approximately

21 additional acres for rights-of-way with 15 displacements, while Option 11 would require

approximately 28 additional acres with 25 displacements.  (*Id.* at 27–28).

The 1991 EA evaluated Options 10 through 12 for environmental impact, including

land use, farmlands, social and economic considerations, right-of-way acquisition and

relocation, noise, air quality, flood plains, runoff and drainage, navigable waterways and

coastal zones, water quality, historical/archeological resources, endangered species, public

parklands/natural areas, construction impacts, visual and aesthetics, and coordination with

other environmental agencies.  (*Id.* at 26–47).  Most relevant to this case, the EA included

a detailed noise analysis performed in conformity with FHWA standards.  (*Id.* at 30–36 &

Ex. O).  The 1991 EA presented the following conclusions:

> Due to the magnitude of the proposed project, and the fact that the impacts on
> the surrounding area are expected to be significant, an Environmental Impact
> Statement (EIS) will be prepared.  Following the studies conducted as a part
> of this Environmental Assessment, Option 10 and Option 12 should be further
> evaluated in the EIS.

(*Id.* at 49).

Public uproar over the proposal TXDOT recommended in the 1991 EA—significantly

widening the highway—resulted in TXDOT scrapping the proposal and submitting a much

less ambitious plan that would not increase traffic capacity.  TXDOT instead proposed to

rehabilitate and modernize the West Loop rather than widen it, eliminating the major

elements included in the plan evaluated in 1991.  TXDOT submitted a report with the goal of securing a documented Categorical Exclusion in December 1992.

### 2.    *The 1992 Categorical Exclusion Report*

The December 1992 TXDOT Categorical Exclusion report is 17 pages of text plus several tables, maps, and other technical data.  (Docket Entry No. 48, Ex. 1).  This report studied  a less ambitious plan to rehabilitate IH-610 after the 1991 plan sparked substantial public opposition.  (*See, e.g.*, Docket Entry No. 48, Aff. of John Mack, ¶ 5).  This proposal did not attempt to add capacity to the highway, but instead to make it capable of handling traffic more efficiently and safely.  The report evaluated the proposed rehabilitation of I-610 West from West Bellfort/South Post Oak to IH-10 West.  The proposed project would require 4.1 acres of additional rights-of-way and 15 displacements, much less than the previous options set out in the 1991 EA report.  (Docket Entry No. 48, Ex. 1 at 1, 17).

The 1992 Categorical Exclusion report repeated the 1991 report's description of the design problems that required remediation:  (1) insufficient distances between existing entrance ramps and subsequent exit ramps; (2) insufficient ramp lengths to provide distances needed for acceleration and deceleration; (3) inadequate vertical clearances beneath certain cross-street arterial overpass structures; (4) inadequate vertical profiles; and (5) shoulders being "temporarily" used as auxiliary lanes.  (*Id.* at 2).  The West Loop was "no longer current with today's design standards," including: (1) the overpasses did not meet vertical clearances now required over crossing arterials; (2) vertical profiles such as vertical grades and curve lengths were inadequate for the desired design speed and "respective stopping

sight distance"; and (3) many access ramps had inadequate length to serve queues during peak hour loading.  (*Id.*).  The 1992 report also noted deterioration from years of heavy traffic, age, exposure to weather, and soil settlement.  The report described the project goals as creating a more efficient and safer public transportation facility, rehabilitating the pavement, replacing bridge structures, reconstructing exist ramps, improving direct connectors, adding auxiliary lanes, reversing and/or relocating ramps, proving U-turns, and related improvements.  (*Id.*).  In short, the proposed improvements were needed to "enhance traffic operation and improve safety conditions of the freeway" and were necessary "to upgrade the operation of the mainlanes of the entire IH 610 Loop."  (*Id.* at 2–3).

The 1992 Categorical Exclusion report assessed the project setting (the types of residential, business, and cultural dwellings in the area), traffic volumes, environmental impacts, social and economic considerations, right-of-way acquisition and relocation, utilities, noise, air quality, water quality, historical/archeological resources, wildlife, vegetation, and construction impacts of the project.  (*Id.* at 3–17).  Most relevant to this case, the noise-impact analysis is particularly detailed.  The report noted that the projected traffic-noise impact exceeded the FHWA's noise criteria of 67.0 dBA(LEQ) for residential land use and 72.0 dBA (LEQ) for commercial land use along the highway.[4]  (*Id.* at 8).  The report analyzed available mitigation measures.  The report rejected vehicle restrictions as

---

[4]       Decibels are indicated as "dBA."  The FHWA uses "Leq" to measure the average traffic sound level. The typical sound in a library is 40 dBA; an air-conditioning unit outside and a clothes dryer at 1 meter inside average 60 dBA; the average street noise of a large city and the sound of a garbage disposal inside at 1 meter average 80 dBA.  (Docket Entry No. 41, App. B at 9 (listing FHWA-approved sound level comparisons)).

inappropriate for noise mitigation because IH-610 serves as a major truck route in Houston. The report rejected construction of berms or "buffer zones" for noise mitigation because they would require additional acquisition of rights-of-way, causing greater displacement of residences and businesses and making the cost prohibitive.  Notably, the report stated that "[s]ignificant changes in horizontal or vertical alignment were not considered because these types of changes would be beyond the scope of the proposed project."  (*Id.*).  The 1992 Categorical Exclusion focused on construction of noise-abatement walls to mitigate the noise problems.

None of the environmental impacts other than noise analyzed in the report raised concerns.  The only "open spaces" potentially at risk were Memorial Park and the Houston Arboretum and Nature Center.  (*Id.* at 4).  The Categorical Exclusion report concluded that the project would not adversely affect these areas because the section of Memorial Park near the highway was heavily wooded and provided "few active activities near the freeway." (*Id.*).  The report also concluded that the Arboretum would not be affected by the project. (*Id.*).  The proposed project would not adversely impact any minority group or physically divide neighborhoods.  (*Id.* at 5–6).  The necessary right-of-way acquisitions included five homes in a subdivision, an abandoned retail facility, a transmission tower maintenance building, a hotel, a strip shopping center, four retail facilities, an auto mechanic shop, and a service station.  (*Id.* at 6).  In the report, TXDOT stated its policy to provide relocation assistance and just compensation to all relocated parties and its intention to proceed only after "all displaced families and business have been provided the opportunity to relocate to

adequate replacement sites." (*Id.* at 7).  TXDOT's testing did not reveal potential air or water quality problems from the project.  (*Id.* at 11).  The project did not intrude on any known archeological sites.  The project area included no endangered or threatened species, nor any threatened vegetation. (*Id.* at 13–14).  The report concluded by stating: "Due to the nature of the proposed improvements a Categorical Exclusion is anticipated."  (*Id.* at 17).

The 1992 Categorical Exclusion report included several tables and charts with specific data.  Table 1 consisted of a description of each "roadway segment" in the project and the proposed improvement.  The proposed improvements matched TXDOT's summary description: improvement of geometrics; merging of lanes; addition and deletion of auxiliary lanes; addition, realignment, and deletion of ramps; and improvement and addition of U-turns and other turn lanes.  Table 1 detailed 84 specific alterations to frontage roads or portions of the highway.  Table 2 compared existing and predicted noise levels based on FHWA-approved tests.  Table 3 listed similar data juxtaposed with proposed noise barrier locations, the mitigating effect of such noise barriers, and a recommended noise barrier proposal.  Table 4 summarized the noise-barrier wall proposals for the project, including the height, length, and cost of each barrier.  Table 5 provided further cost analysis, comparing the cost of each barrier, number of residents impacted, and the cost per resident of each proposed barrier.  Table 6 provided data supporting the air quality conclusions.  The 1992 Categorical Exclusion report also included detailed maps of the project area.  The FHWA approved the project as a Categorical Exclusion, as TXDOT proposed.

### 3.      The 2000 Public Hearing

On June 15, 2000, TXDOT held a public hearing on the IH-610 Rehabilitation Project. TXDOT published notices of the hearing in the *Houston Chronicle,* the large-circulation daily newspaper.  The meeting took place at a public school in Houston.  (Docket Entry No. 48, Ex. 2).  At the meeting, TXDOT officials explained the design plan, displayed schematics of the project, and received written and oral questions and comments from those present. TXDOT's hearing summary noted that the "attendees could be divided into two groups[:] those concerned with issues related to the noise abatement and those concerned with issues related to the potential for increased traffic on the frontage roads."  (Docket Entry No. 48, Ex. 3 at 2).  The hearing summary stated that the focus of the noise-related comments was: (1) the need to extend  proposed noise-abatement barriers; (2) building noise-abatement barriers where none were proposed; (3) constructing elevated ramps in areas where noise abatement was not proposed; and (4) increased traffic on frontage roads.  (*Id.*).  The defendants included as part of the administrative record a transcript of the meeting, the written comments and TXDOT's responses, a copy of an environmental report about the project area, and copies of the schematics displayed at the meeting.  (Docket Entry No. 48, Exs. 2–5).  TXDOT submitted these materials to the FHWA with the 2001 Categorical Exclusion Reevaluation.

In affidavits and other documents, the plaintiffs complain that the 90-minute meeting was an inadequate public hearing; that the TXDOT officials present were rude and unresponsive to questions; and that the information presented at the meeting did not include

a full description of just how high the proposed exit ramp or the related mainlanes and connectors would be. The plaintiffs' criticisms of to the adequacy of the discussion and information are analyzed below.

### 4. The 2001 Reevaluation

The June 2001 Reevaluation begins by explaining that it "is a reevaluation of a segment of the proposed project from south of Westpark to IH 10W, which is approximately 3.8 miles." (Docket Entry No. 41, App. A at 1). According to the report, the entire project for which TXDOT obtained a Categorical Exclusion is 7.53 miles. The introduction also explains that "[t]he Environmental Assessment for the entire IH 610W project, from IH 10W to West Bellfort, received a Categorical Exclusion (CE) on August 17, 1993." (*Id.*). The 2001 Reevaluation largely follows the structure of the 1992 Categorical Exclusion report.

The 2001 Reevaluation listed many of the same problems and the need for improvements included in the 1992 Categorical Exclusion report. The 2001 Reevaluation updated the traffic statistics and includes consideration of new features not required in 1992, such as specific consideration of "environmental justice" issues. (*Id.* at 2, 12). The Reevaluation included a project design description and a table comparing it with the design proposed in the 1992 Categorical Exclusion report. (*Id.* at 6–10). Proposed changes to the bridges included: (1) widening the new bridges to accommodate an additional traffic lane; (2) incorporating fewer bridge pilings for new frontage road designs; (3) placing new bridge pilings outside of the stream channel, eliminating any modification or direct disturbances of Buffalo Bayou and the need for obtaining new rights of way; and (4) placing some new

bridge pilings below the ordinary high water line, necessitating the acquisition of permits from the United States Corps of Engineers.  (*Id.* at 6–7).  Proposed changes to the road design included: (1) widening Katy Road to the first Woodway exit ramp to 4 lanes; (2) adding a grade separated ramp and dropping an auxiliary lane at the first Woodway exit ramp; (3) widening the first Woodway exit ramp to the IH-10 direct connector to 3 lanes; (4) eliminating the plan to widen to three lanes the area covering IH-10 to the direct connector; (5) eliminating the plan to improve geometrics and continue an auxiliary lane at the San Felipe entrance ramp; (6) continuing an auxiliary lane from the San Felipe entrance ramp to the Hidalgo/Richmond exit ramp; (7) dropping (instead of maintaining) an existing auxiliary lane on the Hidalgo/Richmond exit ramp; (8) moving (instead of deleting) the Richmond exit ramp to north of Hidalgo; (9) improving geometrics from the Hidalgo/Richmond exit ramp to US-59 direct connector; (10) adding 1 main lane and 1 auxiliary lane (instead of only 1 auxiliary lane) to the US-59 direct connector; (11) relocating the Richmond entrance ramp (instead of adding a grade separated ramp); (12) maintaining the existing geometrics (in lieu of "improving" them) from the Post Oak entrance ramp to the Woodway entrance ramp; (13) continuing the auxiliary lane from the Post Oak entrance ramp to the IH-10 direct connector; (14) creating a 2 lane entrance ramp splitting IH-610 and the IH-10 direct connector (instead of improving geometrics and adding a second auxiliary lane) at the Woodway entrance ramp; (15) adding a lane at the southbound Main lane over the IH-10 interchange (instead of leaving this area as-is); (16) eliminating the original plan to add a northbound-southbound U-turn and to improve geometrics and channelization at Memorial; (17) adding the U-turn

and a northbound, left-turn lane (instead of improving existing U-turns, lane approaches, channelization, and geometrics) from Woodway to Post Oak; (18) adding a northbound, left-turn lane and a southbound right-turn lane at San Felipe; (19) adding additional turn lanes (in addition to those previously planned) at Westheimer; (20) adding auxiliary lanes between ramps from Westheimer to the Richmond northbound frontage road; and (21) realigning Westheimer to the Richmond southbound frontage road to accommodate ramp improvements.   Approximately twenty-eight of the project design proposals were not changed from the 1992 Categorical Exclusion report.

The 2001 Reevaluation discussed three alternatives: a no-build alternative; improving the highway facility without using Memorial Park land; and building on a new location.  (*Id.* at 11).  The Reevaluation explained that "[t]he no build alternative is not preferred because this alternative would leave an existing facility in place that does not meet current design standards and would not alleviate the current traffic problems."  (*Id.*).  The report also noted that improving IH-610 with no impact to Memorial Park at all would be impossible because the park borders both sides of the highway.  The final alternative, building an entirely new highway, "might help alleviate congestion to the existing facility but would possibly result in far more impacts to Memorial Park and to the human and natural environment than the currently proposed project."  (*Id.*).

The 2001 Reevaluation report noted that unlike the 1992 Categorical Exclusion proposal, which would have resulted in the acquisition of 4.1 acres of rights-of-way and 15 displacements (5 residences and 10 businesses), the amended design project required the

acquisition of 2.9653 additional acres to obtain rights-of-way and would produce only 2 displacements, both businesses.  (*Id.* at 12).  The 2001 Reevaluation report identified the areas of analysis that remained unchanged from the earlier Categorical Exclusion report: (1) environmental justice/socioeconomic impact of the project; (2) land use; (3) farmlands; (4) cultural resources; (5) wetlands; (6) water quality; and (7) navigable waterways.  The following areas received additional analysis and discussion: (1) soils; (2) vegetation; (3) wildlife; (4) threatened and endangered species; (5) migratory bird treaty act; (6) essential fish habitat; (7) parkland; (8) flood plains; and (9) air quality.  The 2001 Reevaluation concluded that the project changes did not result in significant predicted environmental impacts.  Additionally, TXDOT agreed to a land exchange with the City of Houston to lessen the effect on Memorial Park.  According to the Reevaluation report, the land exchange would "actually produce a net gain for Memorial Park."  (*Id.* at 22).

The 2001 Reevaluation included a noise analysis.  Like the previous Categorical Exclusion report, the 2001 Reevaluation concluded that "the project will result in traffic noise impact" necessitating noise-abatement measures.  (*Id.* at 28).  In the Reevaluation, TXDOT considered the following measures:  traffic management; alteration of horizontal and/or vertical alignments; acquisition of undeveloped property to act as a buffer zone; and construction of noise barriers.  (*Id.*).  The Reevaluation report noted that implementing a specific noise-abatement measure requires a finding that the measure is both "reasonable" and "feasible."  The report defined the criteria:  "In order to be feasible, the measure should reduce noise levels by at least five dBA at impacted receivers; and to be reasonable it should

not exceed $25,000 for each receiver." (*Id.*).  The report included detailed noise measurements from receivers placed around the project site.  In the report, TXDOT rejected traffic-management devices as a noise-abatement measure because the minor benefit the devices would provide—one dBA per five mph reduction—was outweighed by the increase in congestion and air pollution the devices would create.  (*Id.* at 30).  TXDOT rejected altering horizontal and/or vertical alignments as a way to reduce noise because those alterations would displace existing businesses and residences and require acquisition of additional rights-of-way, making this option neither cost-effective nor "reasonable." (*Id.*).  TXDOT rejected the use of buffer zones because no undeveloped land existed that could be acquired for this purpose.  (*Id.*).

As noted in the earlier Categorical Exclusion and Environmental Assessment reports, barrier walls presented a "reasonable" and "feasible" noise-abatement measure for certain areas along IH-610 West.  The 2001 Reevaluation recommended placing noise barriers in two locations:  one barrier wall 1253 feet long and 18 feet tall to be placed in the northeast quadrant of the US-59 and IH-610 interchange, and another barrier 552 feet long and 22 feet high to be placed in the Afton Oaks subdivision.  (*Id.* at 30 & Exs. C1, C3, C5).  The 2001 Reevaluation report included assurances that the project contractors would limit construction noise to the extent possible and stated that TXDOT had sent copies of the traffic-noise analysis to local officials.  (Docket Entry No. 41, App. A at 32).

The 2001 Reevaluation report included a list of hazardous materials sites and concludes that there was a potential for "environmental impairment" for those sites located

near the project.  (*Id.* at 41).  In the report, TXDOT noted that the "proposed alignment avoids most tracts that indicate a potential for environmental impacts within the corridor site vicinity."  (*Id.*).  The report stated that if TXDOT encountered contamination during construction, it would develop and implement appropriate management plans.  (*Id.*).

Finally, the 2001 Reevaluation report stated that the project would yield minimal secondary or cumulative impacts after completion.  (*Id.* at 42).  The project's lasting impact, compared to the no-build alternative, would be "the existence of a roadway that is safer than the current facility," that is "up to current highway standards," and that would result in improved traffic flow through the area, and as a result decrease potential levels of air pollution.  (*Id.*).  TXDOT concluded the 2001 Reevaluation report by noting that "[w]ith few exceptions, noted above [in the report], the CE remains valid. . . . therefore, revisions to the CE are not deemed necessary."  The FHWA agreed.

### 5.    *The 2004 Reevaluation Report*

TXDOT submitted a second Reevaluation report in July 2004.  (Docket Entry No. 41, Appendix B).  This Reevaluation report evaluated the project's "last segment extending from south of Post Oak Boulevard to IH 10 West."  (*Id.* at 1).  According to the defendants, TXDOT conducted this reevaluation at the FHWA's request after learning that certain aspects of the noise analysis set out in the 2001 Reevaluation report were inaccurate. Accordingly, the 2004 Reevaluation refers back to the 2001 Reevaluation throughout, except for the section on noise.

The "Traffic Noise" section of the 2004 Reevaluation report stated that "[t]he previous noise analysis remains valid for all land use activity areas adjacent to the segments of the proposed project with the exception of the residential area along North Post Oak Road. Refinements/adjustments in the elevations of the roadways adjacent to this residential area were sufficient to require a new, updated traffic noise analysis." (*Id.* at 8). As in the previous reports, the 2004 Reevaluation discussed the governing FHWA standards for Noise Abatement Criteria and testing procedures, then supplied the results of TXDOT's testing. All fourteen receivers tested in this area reflected noise impact from the project. (*Id.* at 12). TXDOT predicted an average increase of 4 dBA for four receivers; an increase of 5 dBA for seven receivers; an increase of 6 dBA for two receivers; and an increase of 9 dBA for one receiver. (*Id.*). This area studied, which is near the plaintiffs' residence, reflects increased noise impact above the levels predicted in the original Categorical Exclusion and the 2001 Reevaluation.

In the 2004 Reevaluation report, TXDOT evaluated the noise-abatement measures examined in the 2001 Reevaluation report. TXDOT concluded that noise-barrier walls remained the only "feasible" and "reasonable" option for three locations (one more than found in the previous Reevaluation). TXDOT tested potential barriers by conducting a "noise workshop" for adjacent property owners. (*Id.* at 14). Owners of property adjacent to two of the three proposed locations for barrier walls approved them (with the exception of a section of the noise barrier in front of one home). Owners of property adjacent to one proposed location rejected the barrier wall. The 2004 Reevaluation report stated that this

third barrier wall would not be included in the project, but that TXDOT would incorporate the approved barrier walls.

The 2004 Reevaluation report concluded by stating that "revisions to the CE are not deemed necessary."  The FHWA again agreed.

### C.    The Plaintiffs' Summary Judgment Evidence

Ware conducted a noise analysis that purports to conform to the FHWA Traffic Noise Model that TXDOT used in the 2004 Reevaluation.  The plaintiffs included Ware's analysis in the summary judgment record.  (Docket Entry No. 51, Exs. 6, 10).  Ware's study, which is described more fully later in this opinion, used a simplified model of the software TXDOT used and found a greater noise impact than TXDOT had reported.  The plaintiffs also submitted an article from the *Houston Chronicle* dated June 15, 2000, which claims that Norm Wigington, a TXDOT spokesman, stated that TXDOT would hold another public hearing "before the work is contracted in 2003." (*Id.*, Ex. 19).  The plaintiffs submitted bills for contractors working on the project, (*id.*, Ex. 20), and affidavits from Patrick Claude Henry, a TXDOT engineer, from litigation involving a different segment of this project, (*id.*, Ex. 25).  The plaintiffs submitted TXDOT's Guidelines for Analysis and Abatement of Highway Traffic Noise, dated June 1996.  (*Id.*, Ex. 28).  The plaintiffs also submitted their own affidavits, as well as an affidavit from Robert A. Silverman, who lives in plaintiffs' neighborhood and was involved in litigation challenging a different highway construction project.  (*Id.*, Exs. 29–31).  The plaintiffs also submitted substantial correspondence with other community members and public officials, including TXDOT personnel and state and

local elected representatives.  This evidence, which criticizes the agencies' methodology and procedures and describes the negative impacts these individuals anticipate from the IH-610 West Rehabilitation Project, is offered in support of the claims that the FHWA improperly designated the project as Categorically Excluded because of the noise and visual impacts it will have, and that the FHWA relied on a flawed process in making the Categorical Exclusion determination.

### D.     The Decision to Use Categorical Exclusion Status

The plaintiffs focus on the noise-impact analyses in the 1992 Categorical Exclusion, 2001 Reevaluation, and 2004 Reevaluation, contending that the noise that will result from the elevated mainlanes and connectors at the IH-610 West section near and at the IH-10 interchange made the project ineligible for Categorical Exclusion approval.  The plaintiffs allege that the FHWA's acceptance of TXDOT's incorrect noise analysis in 2001 and refusal to revisit the issue after TXDOT conceded its error yet reached the same ultimate conclusion in the 2004 Reevaluation, resulted in an improper grant of Categorical Exclusion status.  The plaintiffs argue that the FHWA did not reveal the underlying assumptions behind the noise analyses performed, and that the record reveals problems with the methodology used and the reliability of the conclusions drawn from these studies.  The plaintiffs complain that the noise analysis performed in 1992 and repeated in the 2001 Reevaluation used incorrect assumptions and methodologies.  More specifically, the plaintiffs assert that TXDOT and the FHWA relied on inaccurate traffic counts, which caused the predicted noise-impact levels to be lower than realistically expected.  The plaintiffs point to the statement in the 1992

Categorical Exclusion report that "significant changes in the horizontal or vertical alignment were not considered because these changes would be beyond the scope of the project," and argue that TXDOT's subsequent decision to realign and raise the elevation of certain ramps, lanes, and connectors demonstrates that the noise analysis was fundamentally flawed. The plaintiffs allege that TXDOT deliberately left the planned elevation changes out of the 2001 Reevaluation report because their inclusion would have compromised the project's Categorical Exclusion status. (Docket Entry No. 70 at 7). The plaintiffs contend that the corrected noise analysis appearing in the 2004 Reevaluation, which showed a higher noise impact on plaintiffs' neighborhood than the 1992 Categorical Exclusion report or the 2001 Categorical Exclusion Reevaluation report, demonstrates that TXDOT used, and the FHWA credited, improper methods from the outset. (Docket Entry No. 70 at 6).

"This Court is not a super professional transportation analyst charged with the duty of determining the propriety of competing methodologies." *Comm. to Pres. Boomer Lake Park v. Skinner*, No. CIV-91-1918-R, 1992 WL 535953 (W.D. Okla. May 21, 1992) (quoting *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 711 (11th Cir. 1975) (internal marks omitted)). The administrative record shows that TXDOT conducted the noise analyses in accordance with FHWA-approved specifications and regulations. Each of the project studies from the 1991 EA forward assessed the projected noise impact. The potential noise impacts received more attention than any other aspect of the project. In 2004, TXDOT performed a new tests and submitted the results to the FHWA, which agreed that the 2004 Reevaluation noise impact results did not alter the decision that the project qualified for a

Categorical Exclusion status.  The 2004 Reevaluation states the reason for the new study: the 2001 Reevaluation had failed to take into account the changes to the roadway elevations adjacent to North Post Oak Road and the effect those changes would have on the amount of noise produced.  Indeed, the stated reasons for the noise-analysis reevaluation are consistent with plaintiffs' assertion that the elevation increases also increased the noise levels that would result and had not been taken into account in predicting noise impact.  The fact that TXDOT issued the 2001 Reevaluation to take into account the numerous changes to the project design since the 1992 Categorical Exclusion Evaluation, and then further revised the Reevaluation in July 2004 after learning that the 2001 noise analysis did not fully take into account the elevation increases in the highway section adjacent to plaintiffs' neighborhood, does not mean that the entire methodology is flawed.

The plaintiffs admit that Ware's competing noise analysis does not follow the FHWA specifications or requirements.  Ware states that he used a "simplified" version of the noise-analysis software TXDOT used in July 2004.  (*See* Docket Entry No. 37, ¶¶ 109–10; Docket Entry No. 51, Ex. 31, ¶¶ 48–49).  Ware's noise analysis presents different readings than the 2004 Reevaluation produced, but his affidavit states that he did not intend his test to show that his results were right and TXDOT's wrong.  Instead, Ware only wanted "to show that the assumptions can have a large impact on the results, and that it is obvious that they [the assumptions underlying the noise analysis] have to be disclosed." (Docket Entry No. 51, Ex. 31, ¶ 49).  Even if the plaintiffs' evidence of noise-impact results could meaningfully be compared with the agency's results, "[t]he court is not empowered to decide that the views

of the plaintiffs' experts have more merit than the agency's experts." *Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp. 2d 1216, 1240 (D. Or. 1998) (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332–33 (9th Cir. 1992)); *see also Public Interest Res. Group of N.J.*, 884 F. Supp. at 891 ("If all that is necessary to require an EIS or EA is a conflicting expert's opinion, the agency's process would be meaningless.") (citations omitted)).

The plaintiffs argue that this court should reject the agencies' conclusions under the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  These cases govern a court's gatekeeper role with respect to expert testimony.  When, as here, "the Court's review is limited to ensuring that the process that produced the result complies with NEPA," *Protect Key West, Inc. v. Cheney*, 795 F. Supp. 1552, 1559 (S.D. Fla. 1992), the *Daubert* standard is difficult to apply.  Although the plaintiffs argue that more information about the assumptions TXDOT used in the tests should be disclosed, the plaintiffs do not appear to dispute that the procedures used complied with the FHWA-approved standards.  And although the plaintiffs argue that TXDOT did not take into account the elevation increases in conducting the 2001 noise analysis, the plaintiffs do not appear to dispute the 2004 revised noise analysis, which showed an increase of 4 to 6 decibels in two receivers and of 9 decibels in one receiver over the 2001 results.  (*Compare* Docket Entry No. 41, App. B at 11–12 (2004 Reevaluation) *with id.*, App. A at 29 (2001 Reevaluation)).

The plaintiffs' claim that the noise analysis used is "insufficient in scope," (Docket Entry No. 70 at 14), collapses the question into the answer.  A Categorical Exclusion project

by definition is not required to provide the level of analysis or documentation required for classes of projects that require an EIS or an EA.  All the reports the FHWA approved included a noise-analysis study that used federally-approved procedures.  Each report found additional noise impact on the affected areas and concluded that with recommended mitigation measures, that impact was not so "significant" as to require an EA or an EIS.

The plaintiffs' argument that the FHWA could not permissibly rely on the Categorical Exclusion to avoid EIS and EA documentation requirements fails as a matter of law.  (Docket Entry No. 70 at 10).  Deference to an agency "is particularly appropriate where an agency is interpreting its own regulations in applying a categorical exclusion."  *Fla. Keys Citizens Coalition*, 374 F. Supp. 2d at 1139 (citing *City of Alexandria*, 756 F.2d at 1020).  "Documentation of reliance on a categorical exclusion need not be detailed or lengthy.  It need only be long enough to indicate to the reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did. . . .  In most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered."  *Id.* at 1139–40 (quoting *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004)); *accord Fritiofson*, 772 F.2d at 1237.  The record before this court includes the 1991 EA Report, the 1992 Categorical Exclusion Evaluation, the 2001 Categorical Exclusion Reevaluation, and the 2004 Reevaluation, which resulted in the approval and continuation of Categorical Exclusion status for the project.   (Docket Entry Nos. 41, Appendices A–B; 48, Ex. 1).  All the reports include an analysis of the requisite considerations, including the project's impact

on the soil, invasive species, vegetation, and wildlife, migratory birds, fish, cultural resources, parklands, wetlands, water quality, and coastal zone management plan. Most relevant to this case, all the reports included a noise analysis of the surrounding area. (Docket Entry No. 41, Appendix A at 24–32; Appendix B at 8–14; Docket Entry No. 48, Exs. 1 at 8–9 & Ex. E; Ex. 1-1 at 30–35).

Defendants argue that this project falls within the nonexclusive list of actions that may qualify under the documented Categorical Exclusion category. That list includes "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g., parking, weaving, turning, climbing)"; and "[b]ridge rehabilitation, reconstruction or replacement." 23 C.F.R. § 771.117(d)(1), (2), (3). In the 1991 EA, TXDOT proposed expanding the traffic capacity of the highway. In the 1992 Categorical Exclusion, TXDOT described the project as including "rehabilitating the pavement, replacing the bridge structures, reconstruction of access ramps, improvements to direct connectors, adding auxiliary lanes, reversing and/or relocating ramps, providing U-turns, etc." (Docket Entry No. 48, Ex. 1 at 2). This general description remained unchanged in the 2001 Reevaluation, which detailed proposed changes for the project. (*See* Docket Entry No. 41, App. A at 6). Plaintiffs argue that the 2002 Reevaluation described a project that exceeded "rehabilitation" and was not, as defendants argue, presumptively appropriate for Categorical Exclusion status.

A close inspection of the record and comparisons between this case and other cases involving highway projects does not show disputed fact issues material to determining

whether the FHWA was arbitrary or capricious in approving and retaining Categorical Exclusion status for the project.  The EA written in 1991 for a much larger proposed highway expansion project (that was never built) described TXDOT's intention to add capacity to IH-610 by adding four mainlanes on each side of the highway.  (Docket Entry No. 48, Ex. 1-1 at 11).  After TXDOT scrapped this idea, TXDOT planned the current project, which is designed to improve the highway's ability to handle existing traffic efficiently by improving and "rehabilitating" the existing IH-610/IH-10 interchange, without adding capacity to handle more traffic.  TXDOT decided not to add mainlanes that would extend the length of the project, but instead would change ramps, and related mainlanes and connectors, to improve traffic flow.  The decision not to add "capacity," TXDOT explained, was not a decision to avoid adding any mainlanes.  Instead, TXDOT did not intend to add mainlanes that would generally widen the IH-610 West area at issue.  The Categorical Exclusion and Reevaluation reports discussed this distinction.  The later reports specifically identify alterations in ramp elevations and the use of "braided" ramps configured so that one goes over another, necessarily requiring increased elevations, to meet the rehabilitation goals. (Docket Entry No. 48, Ex. 1-1 at 11).  TXDOT included explicit discussion of elevated ramps in the Categorical Exclusion Reevaluations and the FHWA considered these ramps in approving the Categorical Exclusion status.

The case law supports the FHWA's distinction between "added capacity" projects, which are not eligible for Categorical Exclusion status, and "safety" and "modernization" projects, which are eligible.  These cases also support the defendants' motion for summary

judgment that, as a matter of law, their decision to approve this project as a Categorical Exclusion was neither arbitrary nor capricious.  In *Public Interest Research Group of New Jersey*, the New Jersey Department of Transportation (NJDOT) received Categorical Exclusion approval for a construction project that added two additional highway lanes for over 21 miles under the same regulatory exception defendants invoke here.  884 F. Supp. at 879–80.   In *Florida Keys Citizens Coalition*, the court quoted the FHWA Categorical Exclusion report, which stated, "We find that roadway reconstruction projects that do not increase capacity, but provide safety improvements and replace bridges . . . are normally categorically excluded from detailed NEPA study."  374 F. Supp. 2d at 1132.  The court noted that the project at issue (rehabilitation and reconstruction of a bridge within a larger road project) met the "more general requirements of 23 C.F.R. § 771.117(a):

> The FHWA's use of a categorical exclusion is appropriate given the agency's documented determination that Road Safety Improvements will not add any general purpose travel lanes and involve only minimal roadway widening for safety and not capacity improvements, that these improvements will not have significant growth or travel impacts, that the improvements will not induce significant impacts on planned growth or land use or have significant impacts on travel patterns, that they will be entirely within the existing right-of-way, thus, not causing the relocation of significant numbers of people, and that an original Project purpose, accommodation of growth in the Florida Keys, was eliminated by downsizing it from the original four lanes to two lanes.

*Fla. Keys Citizens Coalition*, 374 F. Supp. 2d at 1141 (internal citations and footnotes omitted).

Two district courts in this circuit have refused to enjoin or find arbitrary and capricious highway reconstruction projects predicated on this distinction.  *See Riverfront*

*Garden Dist. Ass'n, Inc. v. City of New Orleans*, No. CIV.A.00-544, 2000 WL 1789952, *8

(E.D. La. Dec. 6, 2000) (rejecting challenge to Categorical Exclusion status granted for a

portion of road reconstruction that allegedly had a secondary impact on a historically

significant area); *J.C. Morris & N. Am. Equip. Co. v. Slater*, No. CIV. A. 398-CV-2092-L,

1998 WL 959658, *1–*2 (N.D. Tex. Jan. 15, 1998) (denying a motion for a preliminary

injunction preventing construction that would widen 2.64 miles of a road from two lanes to

six lanes and had Categorical Exclusion approval).  These cases provide support for the

conclusion that the FHWA's Categorical Exclusion approval in this case is not arbitrary and

capricious.

Additional comparisons to *Public Interest Research Group of New Jersey* are

appropriate.  Under earlier regulations, NJDOT prepared an Environmental Assessment and

began planning an Environmental Impact Statement.  Shortly after NJDOT drafted the EA,

however, the FHWA changed its regulations, lowering the requirements for highway projects

to qualify for a Categorical Exclusion.   The amended regulations added the same

"modernization exception," 23 C.F.R. § 771.117(d), used by TXDOT in this case.  Like

TXDOT, NJDOT reevaluated the project and submitted documentation to support its claim

that the project qualified as a Categorical Exclusion.  The FHWA agreed, finding that the

project would cause no significant environmental impact.  *Public Interest Res. Group of N.J.*,

884 F. Supp. at 881.  After receiving approval, NJDOT conducted further studies and decided

to alter the construction plan to add high occupancy vehicle lanes instead of standard

"mainlanes."  *Id.* at 881–82.  Like TXDOT in the present case, NJDOT submitted a

reevaluation study to analyze the effects of the proposed project change.  That study concluded that adding HOV lanes would reduce traffic congestion and cause no environmental impact other than noise to the surrounding neighborhoods.  *Id.* at 882.  To mitigate the noise impact, the reevaluation recommended adding ten barriers.  *Id.*  The FHWA concluded that with the noise barriers, the revised project would not result in significant environmental impact and approved the continued use of a Categorical Exclusion. *Id.*   In evaluating alternatives, NJDOT's report—much like TXDOT's in this case—concluded that no feasible alternatives to construction existed and that no better mitigation measure was feasible or reasonable.  *Id.* at 887.

Citizens challenged the New Jersey plan in much the same way as the plaintiffs in this case.   The New Jersey plaintiffs argued that the project would cause "significant environmental impact," that NJDOT had misled the public about the level of the noise impact, and that NJDOT's reports and findings contained fatal flaws.  The court held that the FHWA was not arbitrary and capricious in both granting and maintaining the project's Categorical Exclusion status.  The FHWA reviewed relevant, appropriate data in making the Categorical Exclusion decision, and the reevaluation allowed the FHWA to revisit its decision if it felt that the changed circumstances or project design would lead to significant environmental impact.   Notably, when NJDOT held a public hearing on the matter, it conceded that it had not yet completed noise analysis on the project.  *Id.* at 883 n.12.  Like the plaintiffs in this case, the court held that NJDOT's sins of omission at the public hearing were insufficient to render the CE determination arbitrary and capricious.  The court noted

that the FHWA "need not elevate environmental concerns over other appropriate considerations."  *Id.* at 890; *see also Skinner*, 1992 WL 535953, at *13 ("Plaintiff implies that a two-lane version of Alternative II should have been considered by the FHWA, is feasible, prudent and would minimize harm to the park.  The FHWA could reasonably find that such an alternative would not accomplish the purpose of the project to serve present and projected traffic volumes and would be inconsistent with the City's Transportation Plan and reject such an alternative for the same reasons *a fortiori* it rejected Alternative II as imprudent.").

In this case, the fact that TXDOT admitted that it had miscalculated part of its noise analysis in the 2001 Reevaluation and issued the revised noise analysis in the 2004 Reevaluation, does not raise a fact issue as to the Categorical Exclusion status determination. The 2004 Reevaluation report stated that "[r]efinements/adjustments in the elevations of the roadways adjacent to this residential area were sufficient to require a new, updated traffic noise analysis." (Docket Entry No. 41, App. B at 8).  TXDOT admitted in July 2004 that the increases to certain roadway elevations in the project design along one section of the project made the noise-impact projections for that section incorrect.  Aside from a conclusional statement that "[t]here are still many inconsistencies regarding the new noise analysis" at the end of their reply to the motion for summary judgment (Docket Entry No. 51, ¶ 87), the plaintiffs do not appear to argue that the 2004 Reevaluation, which the FHWA could have, but did not, use to withdraw the Categorical Exclusion approval, contained inaccurate noise measurements.

The fact that TXDOT and the FHWA recommended mitigation measures does not undermine the ultimate finding of no significant environmental impact (FONSI). As the Fifth Circuit has recently reiterated, an agency's use of a "mitigated FONSI" is permissible. In *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003), the court explained that "an agency or an involved third party" may "agree[ ] to employ certain mitigation measures that will lower the otherwise significant impacts of an activity on the environment to a level of insignificance" to permit "a FONSI [to] be issued for an activity that otherwise would require a full-blown EIS." *Id.* at 241; *see also id.* ("Other circuits have endorsed such a practice.") (citing and further discussing *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982); *C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569 (11th Cir. 1988); *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992); *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58 (4th Cir. 1991); *Audobon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428 (9th Cir. 1992)). In this case, the FHWA approved a "mitigated FONSI" by identifying potential noise impact to certain areas and recommending mitigation measures. The agency concluded that mitigation of the noise problems rendered any environmental impact insignificant. In light of the deference owed the agency, the overall nature of the project, and the lack of any other environmental concerns, this determination was not arbitrary or capricious.

The plaintiffs contend that the proposed mitigation measures are ineffective for houses that, like theirs, are affected by the project but not immediately adjacent to the highway. The record shows that after the FHWA designated the project as a Categorical Exclusion, TXDOT modeled the noise level at plaintiffs' residence. The measurement, which TXDOT

reported to the plaintiffs in a letter dated February 4, 2004, was 58 dBA, within acceptable limits. (Docket Entry No. 51, Ex. 9). The plaintiffs point out that the 2004 Reevaluation of two TXDOT-placed receivers in their neighborhood reflect noise levels of 76 and 71 dBA, respectively. (*Id.* at 15). According to FHWA standards the plaintiffs submitted, an increase of 15 decibels is considered "substantial" and requires evaluation of mitigation measures. (*See* Docket Entry No. 59, Ex. 2 at 8, 34). The plaintiffs claim that TXDOT intentionally included low noise-level predictions in the early reports to obtain the Categorical Exclusion, but included the more accurate figures in response to the litigation. Plaintiffs build on this argument to contend that the agencies should permit a more generous cost/benefit analysis in determining which neighborhoods should receive noise barriers. Specifically, the plaintiffs contend that their neighborhood should receive a noise barrier even if it does not qualify for one under the FHWA-approved formula and even if the homeowners whose residences are closer to highway do not want a barrier.[5] (*Id.*).

Plaintiffs' criticism of the earlier noise-impact projections does not make the FHWA's decision to use the Categorical Exclusion status arbitrary or capricious. The FHWA concluded that the increased noise level in the plaintiffs' neighborhood, considering the

---

[5]

TXDOT required permission from homeowners residing adjacent to the project before erecting any noise barriers. Plaintiffs, who live near the highway but whose condominium does not directly border the highway, object to this method of permitting adjacent homeowners a "veto" over the mitigation method. Plaintiffs have pointed to no regulation or case law prohibiting this approach to noise mitigation. The court notes, however, that the FHWA publication, "Highway Traffic Noise Analysis and Abatement Policy and Guidance," the plaintiffs submitted states that "the views of the impacted residents should be a major consideration in determining the reasonableness of the abatement." (Docket Entry No. 59, Ex. 2 at 59). The plaintiffs have not created a fact issue as to whether the agencies involved in this decision failed to consider the concerns of the affected residents.

reasonable and feasible mitigation measures available, did not mean that the project had a "significant environmental impact" requiring different treatment under NEPA.  The FHWA's noise-mitigation inquiry focuses on whether a proposed mitigation measure is reasonable and feasible, not whether the mitigation measure is preferred by all those affected or as effective as those affected would like.  The record shows, and the plaintiffs do not appear to dispute, that traffic-noise levels in plaintiffs' neighborhood exceeded federal standards *before* the IH-610 Rehabilitation Project began.  (*See, e.g.*, Docket Entry No. 41, App. B at 12 (listing prehabilitation project noise levels compared with federal standards)).  NEPA "does not impose an affirmative obligation upon the FHWA to study and undertake mitigation measures to improve pre-existing environmental conditions." *Fla. Keys Citizens Coalition*, 374 F. Supp. 2d at 1146–47 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–53 (1989)).  In 2004, the FHWA and TXDOT reconsidered the noise impacts of the project on neighborhoods near the elevated lanes and connectors and implemented additional mitigation measures.  *Cf. id.* at 1147.  Plaintiffs have not raised a fact issue as to whether the FHWA's approval of Categorical Exclusion status, based in part on the conclusion that an increase of 4 to 6 decibels (with one receiver going up to 9 decibels, (*see* Docket Entry No. 41, App. B at 12)), did not constitute a significant environmental impact.  FHWA regulations require *consideration* of noise mitigation measures at the levels of increased noise predicted by the plaintiffs and TXDOT in this situation.  (*See* Docket Entry No. 59, Ex. 2 at 8, 34).  The agencies considered and implemented such mitigation measures to the extent they found the measures reasonable and feasible, in accordance with FHWA

regulations.   The record presents no basis for this court to require further or different consideration.

Based on a liberal reading of the pleadings, the plaintiffs appear to argue that the FHWA (in conjunction with TXDOT) improperly "segmented" the highway project into smaller pieces to evade NEPA requirements—namely the EIS requirement. " 'Segmentation' or 'piecemealing' is an attempt by an agency to divide artificially a 'major Federal action' into smaller components to escape the application of NEPA to some of its segments." *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1140 (5th Cir. 1992).  FHWA regulations establish several factors used to determine whether a project has been improperly segmented.  *See* 23 C.F.R. § 771.111(f).  The Fifth Circuit has summarized these factors, explaining that "[s]egmentation becomes suspect . . . only after an evaluation of . . . whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects."  *Save Barton Creek Ass'n*, 950 F.2d at 1140.  "In the context of a highway within a single metropolitan area, as the case at issue—as opposed to projects adjoining cities—courts have focused more on the factor of 'independent utility.' " *Wilds v. S.C. Dep't of Transp.*, 9 Fed. App. 114, 120 (4th Cir. 2001) (quoting *Save Barton Creek Ass'n*, 950 F.2d at 1140) (additional citations omitted).

TXDOT divided the highway project into six segments for construction.  The segment at issue is 3.8 miles, beginning at the intersection of I-610 and US-59 and ending at the intersection of I-610 and I-10, or the I-610 interchange.  The Categorical Exclusion and 2001

Reevaluation both include maps indicating the different segments. (*See* Docket Entry No. 38, Ex. 1, Ex. A; Docket Entry No. 41, App. A, Ex. A).  This portion of highway has "independent utility" because it served as a major connection to two highways (US-59 and I-10) before the project began.  Each piece of the project could be completed independently of the others.  Using this division across a major highway is logical—treating the entire construction project would require comprehensive evaluation of disparate areas of the city, different terrain, and different highways.  Plaintiffs have not pointed to evidence that might support a finding that the defendants improperly segmented the project in order to omit certain environmentally-sensitive areas from regulatory assessment or otherwise evade NEPA's requirements. *Cf. Named Individual Members of San Antonio Conservation Soc'y v. Tex. Highway Dep't (San Antonio I)*, 446 F.2d 1013, 1027 (5th Cir. 1971) (holding that the state had impermissibly segmented a highway project running through a park to evade federal environmental regulations).  In fact, because the part of the project at issue, near plaintiffs' residence, is also near Memorial Park, the segmentation most likely *helps* the plaintiffs' case. Instead of evaluating the noise impact on plaintiffs' neighborhood and the potential environmental damage to the park in the context of a 7.53 mile project, the defendants evaluated these potential impacts against a project of only 3.8 miles.  Furthermore, the plaintiffs have not identified any specific area or resource harmed by the project but omitted from the administrative record because of the defendants' "segmentation."  To the extent that plaintiffs argue that the defendants improperly segmented the project, the claim fails. *Accord*

*One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004); *Save Barton Creek Ass'n*, 950 F.2d at 1144; *Riverfront Garden Dist. Ass'n*, 2000 WL 1789952, at *9.

The plaintiffs contend that TXDOT and the FHWA failed to hold a "public hearing" as required under 23 U.S.C. § 128. (Docket Entry Nos. 51 at 19; 70 at 15). The plaintiffs did not attend the June 2000 hearing on the project. Although there is a dispute as to the tone of the 2000 hearing, the responsiveness of the officials present to the questions raised, and whether the hearing provided any meaningful opportunity for an exploration of the issues, it is undisputed that the meeting was announced publicly well in advance; that it occurred as scheduled; that knowledgeable TXDOT representatives involved in decisionmaking roles in the project attended; and that citizens attending made oral and written complaints about the plans, including the noise impact. TXDOT displayed schematics that showed the project plans. It is not clear whether the schematics showed the precise elevations of the exit ramp or the mainlanes and connector lanes near the plaintiffs' neighborhood. The record as to the way in which the 2000 meeting was conducted and the schematics presented does not show that TXDOT and the FHWA concealed the fact that the project included these elevated ramps, so as to raise a fact issue as to statutory or regulatory compliance.

This court concludes that the FHWA's contemporaneous documentation reflects its consideration whether a Categorical Exclusion applied to its approval of the IH-610 project at issue and its conclusion that it did. This court concludes that the FHWA's application of a Categorical Exclusion as compliance with NEPA is not arbitrary and capricious. These improvements, by definition and in the spirit of the regulations, fall within the types of

highway modernization activities specifically enumerated under 23 C.F.R. § 771.117(d)(1), (2) and (3) as road restoration, rehabilitation, and reconstruction improvements; shoulder and auxiliary lane additions; and highway safety improvements that do not increase traffic capacity.  Based on its past experience with these types of improvements, the FHWA determined that this portion of the IH-610 project warranted a documented Categorical Exclusion.  The FHWA's decision is also supported by the documented determination that the project would not add general purpose main travel lanes and instead involved changes in ramps, mainlanes, and connectors for safety and not capacity improvements, that these improvements will not have significant growth impacts, that the improvements will not have significant impacts on planned land use, that they will be largely within the existing right-of-way, not causing the relocation of significant numbers of people, and that an original project purpose—to increase traffic capacity—was eliminated by downsizing the project, which initially focused on adding a large number of mainlanes and greatly widening the highway.

The primary question is whether the highway project would have "significant environmental impact."  "According to CEQ regulations, 'significantly' requires an agency to consider the 'context' and 'intensity' of a project's environmental consequences." *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 957 (5th Cir. 2003) (citing 40 C.F.R. § 1508.27(a)–(b)).  The record reveals that the area next to plaintiffs' neighborhood already hosted a major freeway and the concomitant visual and noise impacts.  The record reveals that changes to the project over time did increase elevations of the section near the plaintiffs'

neighborhood and increased the noise level that would result despite mitigation efforts, in an area where the noise already exceeded federal guidelines.  *(See, e.g.*, Docket Entry No. 41, App. B at 12 (listing prerehabilitation project noise levels compared with federal standards)).  In light of the deference that the law requires be given to the agency decisions, the substantial competing interests, the overall context of the project, the absence of additional factors of environmental significance, and the potential to mitigate the only identified "significant" environmental impact, the record does not raise a fact issue as to whether the FHWA's decision was arbitrary and capricious.

The plaintiffs have asked this court to issue a preliminary injunction to require a new noise analysis to be conducted under court supervision, with plaintiffs' participation, and to stop the construction until a new court-supervised noise mitigation plan can be developed and approved.  (Docket Entry No. 70 at 17–18).  The defendants correctly respond that this court lacks authority to grant such relief, and at most could remand to the agencies for further proceedings.  That step, however, is dependent on a finding that the agencies violated NEPA in approving the IH-610 Rehabilitation Project as a Categorical Exclusion from more demanding environmental analysis and reporting obligations.  Because this court has found that the challenged agency action is neither arbitrary nor capricious, the plaintiffs' application for a preliminary injunction also fails.

IV.     **Conclusion**

The defendants' motion for summary judgment is granted.[6]  The plaintiffs' motion for

a preliminary injunction is denied.  No later than April 14, 2006, the parties must submit a

written statement identifying any remaining issues and, if appropriate, a proposed final

judgment.

SIGNED on March 15, 2006, at Houston, Texas.

_____
                        Lee H. Rosenthal
                United States District Judge

---

[6] Because this court grants the defendants' motion for summary judgment on the basis of the administrative record, it need not reach the defendants' laches argument.